[Civ. No. 19204. First Dist., Div. One. Apr. 27, 1961.]

JULIO NAJERA, Appellant, v. SOUTHERN PACIFIC
COMPANY (a Corporation), Respondent.

William T. Belcher, Jr., for Appellant.

Louis L. Phelps, G. Blandin Colburn, Jr., and Dunne, Dunne & Phelps for Respondent.

TOBRINER, J.— ■■■ This case raises a question of first impression in this state: Is a railroad employer liable to an injured employee pursuant to the terms of the Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.) for injuries proximately caused by the employer's negligent employment and retention in employment of a person of violent and dangerous propensities? Since we sustain such liability we believe that the trial court's judgment on the pleadings should be reversed and appellant allowed to submit proof of the employer's negligence and its causal relation to appellant's injuries.

Appellant employee's complaint under the Federal Employers' Liability Act alleged a breach of respondent's duty "to provide . . . a reasonably safe place" of work in "that defendant [respondent], its agents, servants and employees, other than plaintiff, did carelessly and negligently employ and retain in their employ a man of violent and dangerous propensities," and "that as a direct and proximate result of said carelessness and negligence . . . [appellant] was set upon by said violent and dangerous man receiving" injuries.

Respondent answered the complaint, admitting appellant's employment, but denying all other material allegations; respondent then moved for judgment on the pleadings on the ground that the complaint "fails to state facts sufficient to constitute a cause of action under the Federal Employers' Liability Act. . . ." The court so found and granted the motion; hence, this appeal.

■■■ Since we consider, here, a judgment on the pleadings, "our review is limited to the question whether, under the facts pleaded, the amended complaint states the substance

of a cause of action on any theory." *Byson* v. *City of Los Angeles* (1957), 149 Cal.App.2d 469, 472 [308 P.2d 765]; *Seeger* v. *Odell* (1941), 18 Cal.2d 409, 412 [115 P.2d 977, 136 A.L.R. 1291]; *Rannard* v. *Lockheed Aircraft Corp.* (1945), 26 Cal.2d 149, 151 [157 P.2d 1]. ▮ "The case is reviewed, therefore, the same as would be a judgment of dismissal entered following the sustaining of a general demurrer . . ." *Gill* v. *Curtis Publishing Co.* (1952), 38 Cal.2d 273, 275 [239 P.2d 630]. ▮ Hence we look to see if a cause of action "can be inferred by reasonable intendment from the matters which are pleaded, although the allegations of these facts are intermingled with conclusions of law. . . ." *Krug* v. *Meeham* (1952), 109 Cal.App.2d 274, 277 [240 P.2d 732].

Following these liberal guide lines we view the complaint as an attempt to state a cause of action for injuries suffered by appellant when "set upon," during the course of his employment, by another employee, who, at the time, was employed by the employer. "Regularly employed by defendant [respondent] as a section Foreman," appellant on September 25, 1956, according to the complaint, engaged in work for defendant near Pinole, California. "At said time and place" respondent owed him "the duty of exercising ordinary care to provide plaintiff [appellant] with a reasonably safe place in which to perform his work . . ."; respondent failed in so doing "in this": Respondent "did carelessly and negligently employ and retain in their employ a man of violent and dangerous propensities"; as a "proximate result" of respondent's carelessness, appellant "was set upon" by this man and received injuries.

We believe the reasonable intendment of these allegations is that the assailant was *employed* by the employer at the time and place of the assault; he was neither a stranger nor an employee coming back to the job site on his day off or when off duty, as respondent suggests. We accept the intendment of the pleadings that "at said time and place" respondent "did employ" the man as sufficient to allege respondent's employment of the aggressor at the time of the assault. Respondent did not pursue its remedy for greater specificity in the pleadings by means of a demurrer; having elected to proceed by judgment on pleadings respondent should not now be in a position to impose its special and narrow interpretation upon them. Consequently, we confine ourselves to the question presented as we have explained it. If upon trial

respondent were to prove that the assailant was *not* in the employ of respondent at the time of the assault, the trial court would face different questions of causation and liability from those we consider here.

The touchstone of liability in this matter is section 51 of the Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.), which provides in part, as follows: "Every common carrier by railroad . . . [while engaging in interstate commerce] shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." (§ 51.) Because the railroad negligently employed "a man of violent and dangerous propensities" and the injury suffered by appellant resulted from such negligent employment, appellant contends that the statute fastens liability upon respondent.

We do not believe, however, that the federal cases applying this section should be the only cases which we review. We cannot overlook the fact that we are deciding here the liability of an employer for the commission of an alleged tort. Certainly, in view of the history and purpose of FELA, a determination of whether the alleged wrongful action constituted a common law tort must be important. We think, too, that it is relevant to inquire into the liability of employers for comparable injuries to seamen. We recognize that seamen fall under a special statute and historically occupy a unique status, but we shall point out that a special status likewise is emerging for employees in general. After this background survey we shall probe the United States Supreme Court and federal cases on FELA. We shall conclude with a brief summary of the state cases.

The cases hold that the knowing employment of a dangerous employee who inflicts injury upon a fellow employee constitutes a common law tort on the part of the employer. Indeed the employer railroad at common law owed a duty to its employees to use "reasonable care . . . in the selection of competent fellow servants, and in the retention in his service of none but those who are. . . ." (*Norfolk & Western R. R. Co.* v. *Hoover* (1894), 79 Md. 253 [29 A. 994, 995]; quoted

in *Missouri, K. & T. Ry. Co. of Texas* v. *Day* (1911), 104 Tex. 237 [136 S.W. 435, 439]; accord, *Gilman* v. *Eastern R. Corp.* (1865), 92 Mass. 233, 238 [87 Am.Dec. 635].) Moreover, "there could be no difference whether the injury result from negligence in doing the master's work, or from an assault made by a dangerous, drunken, and desperate employe, if his reputation was such that the master might reasonably have foreseen such consequences." (*Missouri, K. & T. Ry. Co. of Texas* v. *Day, supra,* 136 S.W. 435, 440.) In that case the employee of the railroad, who was known to be quarrelsome and quick-tempered as well as a "drinking man," assaulted a fellow employee. The court considered two questions: (1) whether the railroad was negligent in "employing and retaining" the assaulter, and (2) whether the acts of the employee could be imputed to the railroad. Denying liability on the doctrine of *respondeat superior* the court submitted the case to the jury on the theory of the employer's negligent hiring and retention of the employee.[1]

Other authorities, including the Restatements of Agency and Torts, recognize the employer's duty as to the proper selection of his employees. Section 213 of Agency, second, states: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . (b) in the employment of improper persons. . . ." The comment under that section declares further: "An agent, although otherwise competent, may be incompetent because of his reckless or vicious disposition, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. . . ." (Comment d.)

The Restatement of Torts enunciates this rule as to the employer's direct negligence in section 317: "A master is under a duty to exercise reasonable care so to control his servant while acting outside the course of his employment as to prevent him from intentionally harming others . . . if (a) the servant (i) is upon the premises in possession of the master . . ., and (b) the master (i) knows or has reason to

---

[1] See also *Fletcher* v. *Baltimore & Potomac Railroad Co.* (1897), 168 U.S. 135 [18 S.Ct. 35, 42 L.Ed. 411], recognizing a cause of action against a defendant railroad, which had knowledge of the situation, for its failure to prevent employees, acting beyond the scope of their employment, from throwing objects from the train to the injury of persons on the street.

know that he has the ability to control his servant, and (ii) knows or should know of the necessity and opportunity for exercising such control.''[2]

We cannot overlook the anomaly of the recognition of the tortious impact of respondent's alleged conduct at common law[3] and respondent's claimed immunity as to the same conduct under FELA. In eliminating as bars to recovery the application of the fellow servant doctrine, the assumption of the risk and contributory negligence, the act sought an enhanced, and not reduced, protection for railroad employees. And yet the strange result of respondent's position here must be a diminution of the rights of employees under the act as compared to their rights at common law.

The courts have likewise held employers liable under the Jones Act for the employment of seamen of a known vicious nature who have injured fellow seamen.[4] In *Boudoin* v. *Lykes Bros. S. S. Co.* (1955), 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed.

---

[2]See also 2 Harper and James, The Law of Torts, section 18.7, pages 1056-1058; 3 LaBatt, Master and Servant (2d ed., 1913), sections 1079, 1080; Prosser, The Law of Torts (2d ed., 1955), sections 63, 67.

[3]In similar fashion, the courts, in resolving issues in fields other than that of railroad employment, have recognized the common law liability of employers for their direct negligence in hiring or retaining in their employ persons with known characteristics which might subject other persons to danger. [*S. Birch & Sons* v. *Martin* (9th Cir., 1957), 244 F.2d 556: ''The relationship of employer and employee creates under certain circumstances a duty on the employer to use reasonable care to control the activities of the employee on the work premises so as to prevent harm to persons coming onto the premises, despite the fact that such activities are not within the scope of employment and are done solely to advance the personal interest of the servant [omitting footnote]. Prerequisite to liability is a showing that the employer knew or should have known of the necessity and opportunity for exercising such control.'' (P. 561.); *Argonne Apartment House Co.* v. *Garrison* (D. C. Cir., 1930), 42 F.2d 605 [59 App.D.C. 370]: Employee stole jewelry; no proof of negligence on part of defendant in employing thief; implication of case is that if plaintiff had proved such negligence, employer might be liable; *Fleming* v. *Bronfin* (Muni. Ct. D.C., 1951), 80 A.2d 915: Delivery man assaulted customer; employer liable if negligent hiring; *Bomba* v. *Borowicz* (2d Dep't., 1942), 265 App.Div. 198 [38 N.Y.S.2d 403]: Restaurateur employed and retained in employment his wife whom he knew had a vicious nature; she assaulted another employee; he was held liable for negligent hiring and retaining her as an employee; *Swinarton* v. *Le Boutillier* (1894), 148 N.Y. 752 [43 N.E. 990]: Merchant hired boy with propensity to mischief who injured customer; merchant liable for ''absence of proper diligence in the protection of the plaintiff.'' (28 N.Y.S. 53, 54.)]

[4]*Kyriakos* v. *Goulandris* (2d Cir., 1945), 151 F.2d 132; *Koehler* v. *Presque-Isle Transp. Co.* (2d Cir., 1944), 141 F.2d 490, cert. den. 322 U.S. 764 [64 S.Ct. 1288, 88 L.Ed. 1591]; *Jensen* v. *United States* (3rd Cir., 1950), 184 F.2d 72.

354], the Supreme Court, while not adjudicating the issue of negligence, found the shipowner responsible for injuries to a seaman inflicted by a known, dangerous fellow seaman on a theory of breach of seaworthiness, saying: ''We see no reason to draw a line between the ship and the gear on the one hand and the ship's personnel on the other [footnote omitted]. A seaman with a proclivity for assaulting people may, indeed, be a more deadly risk than a rope with a weak strand or a hull with a latent defect. The problem, as with many aspects of the law, is one of degree. . . . A vessel bursting at the seams might well be a safer place than one with a homicidal maniac as a crew member.'' (Pp. 339-340.)

The status of the seaman has, of course, been a favored one in the law. He has been considered a ''ward of the admiralty''; responsibility for his safety has been posited upon the owners. (*Mahnich* v. *Southern S. S. Co.* (1944), 321 U.S. 96 [64 S.Ct. 455, 88 L.Ed. 561].) So, too, the seaman has been protected in his contract dealings. (*Hume* v. *Moore-McCormack Lines* (2d Cir., 1941), 121 F.2d 336; Robinson, Admiralty (1940), 291 ff.)

We cannot ignore, however, that considerable authority holds that employees, in general, occupy a special kind of status. Both employee and employer are involved in a status relationship, imposing special obligations and rights upon each of the parties. This emerging relationship finds expression in statutes and decisions.[5]

The obligation of the employer at common law to provide a safe *place* in which to work, discussed *supra,* is but a manifestation of such status, an obligation which arises from an imposition of the law rather than from a contract between

[5]The relation of the employee to the employer, fixing a status of the employee in the factory community, is elaborately specified by statute (Labor Management Relations Act, 1947, 61 Stat. 136, as amended; 29 U.S.C.A. § 141.) See *J. I. Case Co.* v. *National Labor R. Board* (1944), 321 U.S. 332 [64 S.Ct. 576, 88 L.Ed. 762]. The employee occupies a status in his relation to the labor union. ''It must afford the defendant a fair trial including notice, hearing, the right to confront witnesses and accusers, the right to cross-examine them and the opportunity to refute their evidence. These requirements of due process in union trials will be judicially imposed even if the union rules fail to provide for them.'' (Omitting footnotes.) Margolin, *Duties and Rights of California Unions: A Study in Policy Changes* (Aug. 1959), 11 Hast. L. J. 23, 26-27. As Pound has fully expounded, workmen's compensation acts rest upon the concept that employees occupy a special status. Pound, The Spirit of the Common Law, pp. 27-31; See also Friedman, Law and Social Change in Contemporary Britain, pp. 19-22; pp. 34-35; Friedman, Law in a Changing Society, 108 ff. 116 ff; Kahn-Freund, *Collective Agreements under War Legislation* (1943), 6 Modern L. Rev. 112, 117.

the parties. As the courts have established status rights for seamen because of the peculiar dependence of seamen upon employers, similar, albeit less extensive, status rights have been established for employees generally, and the reason for such holding probably lies in the analogous, if less, complete dependency of the general employee upon the employer. The status of the seaman in his right to safety in the *locus* of his employment is at least comparable to the status right of the general employee as to the same subject matter.

Having briefly surveyed the areas of liability at common law for the tort alleged here and of liability for such injury suffered by seamen, we approach the field of FELA. The applicable law must be, of course, federal law. "All questions of substance presented in actions under this statute [FELA] are federal questions upon which the decisions of the federal courts are conclusive and binding upon all state courts." (*Keiper* v. *Northwestern Pac. R. R. Co.* (1955), 134 Cal.App.2d 702, 706-707 [286 P.2d 47, 288 P.2d 262]; accord, *McMillan* v. *Western Pac. R. R. Co.* (1960), *(Cal. App.) 6 Cal. Rptr. 454.)

The leading Supreme Court case on assaults by fellow employees under the FELA, and the decision heavily relied on by respondent, *Davis* v. *Green* (1922), 260 U.S. 349 [43 S.Ct. 123, 67 L.Ed. 299], has certainly engendered disagreement and doubt as to its exact holding. In attempting to determine liability, if any, for the hiring and retaining of a dangerous employee, later cases and subsequent commentators do not agree as to whether the case has denied liability of the employer only if it is charged under the doctrine of *respondeat superior* or has foreclosed liability, as well, upon the theory of direct negligence for such initial employment and retention in employment of the dangerous employee.

In *Davis* an engineer wantonly and wilfully killed a railroad conductor after a quarrel as to the manner in which a switch had been thrown. The original declaration filed in the state court alleged "that the engineer [assaulter] was an unsafe and dangerous man to be employed and with whom to work, on account of his quarrelsome, dangerous, and vicious habits and character, which were known to, or by the exercise of reasonable diligence ought to have been known to, the

---

*A hearing was granted by the Supreme Court on September 7, 1960. The final opinion of that court is reported in 54 Cal.2d 841 [9 Cal.Rptr. 361, 357 P.2d 449].

appellant [railroad]." (*Hines* v. *Green* (1921), 125 Miss. 476 [87 So. 649, 650].) The defendant pleaded the FELA, contending that plaintiff had not stated a cause of action. Appellee, as administratrix, filed a new suit under the FELA alleging the circumstances of the death and "that at the time of the injury the deceased and the engineer were engaged in the business of the master and in furtherance of the master's business. . . ." (P. 650.) After trial of the two consolidated suits appellee received a verdict and judgment.

The proof at the trial demonstrated the railroad employer's knowledge of the engineer's past quarrels and vicious nature. The Supreme Court of Mississippi discussed "whether or not the killing grew out of the master's business while the two men were employed about the master's business" (p. 651) and stated: "[I]f the assault is made while acting within the course of his employment and with a view to his master's business, the master is liable, especially where he has knowledge that the servant has such a character for violence . . . as to make the assault probable. . . . In the present case there is ample proof that the master had knowledge of the . . . violent character of the engineer . . . as to make him liable regardless of the rule above stated, provided, of course, that the servant was acting within the scope of his employment. . . ." (P. 651.) Although the Mississippi court alluded to the "proof that the master had knowledge of the vicious disposition and violent character of the engineer" the court repeatedly stated that the employer's liability is predicated upon the condition that "the engineer was acting within the scope of his employment and with a view to his master's business." (P. 651.) The court did not consider whether the negligent hiring and retention of a dangerous employee imposed liability upon the employer for injuries inflicted by such an employee; the court based its decision solely upon the doctrine of *respondeat superior*.

Upon appeal, the Supreme Court of the United States, through Mr. Justice Holmes, determined that "The ground on which the Railroad Company was held [in the state court] was that it had negligently employed a dangerous man with notice of his characteristics, and that the killing occurred in the course of the engineer's employment." (260 U.S. at p. 351.) The court found no evidence that the killing was "done to further the master's business" and concluded: "We see nothing in the evidence that would justify a verdict unless the doctrine of *respondeat superior* applies." (P. 352.)

The subsequent case of *Tatham* v. *Wabash R. Co.* (1952), 412 Ill. 568 [107 N.E.2d 735] thus analyzes Davis: "[I]t is apparent that what the Supreme Court considered in Davis v. Green was . . . the railroad company's liability *as principal* for the tortious actions of the assailant employee. It did not consider the employer's *direct* liability for negligently hiring or retaining a dangerous worker on the premises and, indeed, hardly could have in view of the development of the case. The plaintiff's complaint under the Federal act was essentially on a *respondeat superior* theory, and the Mississippi court's decision, bottomed on both State and, as they saw it, Federal law, centered upon that issue. While some of the language employed by Mr. Justice Holmes may appear to have a broader scope, the discussion itself concentrates almost entirely upon whether the engineer's act was within the scope of his employment and in furtherance of the master's business. . . ." (P. 737.)

As the Illinois court suggests, the primary concern of the Supreme Court in *Davis* was an analysis of the liability of the employer in the status of a principal, responsible for the acts of his agent, rather than as a direct tortfeasor liable for his negligent act of hiring. But, as respondent asserts, Mr. Justice Holmes also states, "We see nothing in the evidence that would justify a verdict *unless* the doctrine of *respondeat superior* applies." (Emphasis added, p. 352.)

These last words have cast over two decades of decisions a long shadow of doubt. Some courts have applied the language literally and in effect said that it abolished any action against an employer for a tort caused by a malicious employee negligently hired. Other courts have said that the Supreme Court could not have intended so sweeping a result upon so little analysis. The subsequent Supreme Court cases of 1957, however, throw light on the issue, and, the decision in *Lillie* v. *Thompson* (1947), 332 U.S. 459 [68 S.Ct. 140, 92 L.Ed. 73], substantially clarifies it. We turn to an analysis of this somewhat unruly parade of precedents.

The second case chronologically after *Davis*, the decision in *Atlantic Coast Line R. R.* v. *Southwell* (1927), 275 U.S. 64 [48 S.Ct. 25, 72 L.Ed. 157], likewise written by Mr. Justice Holmes, necessarily shows his own appraisal of *Davis*. In *Southwell* the suit of a widow of a railroad employee arose from a fellow employee's perpetration of her husband's murder, which, she alleged, the employer " 'with gross negligence wilfully and wantonly caused, permitted and allowed.' " (P.

65.) Justice Holmes noted: "In view of the decision in *Davis* v. *Green*, 260 U.S. 349 [43 S.Ct. 123, 67 L.Ed. 299], the plaintiff did not attempt to hold the petitioner liable as principal in the act, but relied upon its failure to prevent the death." (P. 65.) If *Davis* barred recovery even upon an allegation of direct negligence, that case would have ended the matter there. Justice Holmes, however, proceeded to consider whether the employer should have realized the potential danger of aggression by the fellow employee, and concluded that the evidence did not warrant a judgment "that a wilful homicide 'resulted' from the failure of some superior officer to foresee the danger and to prevent it." (P. 65.) The court, then, negated liability because of lack of proximate causation; the court did not consider *Davis* conclusive on any matter but liability as *respondeat superior*.

*St. Louis, etc., Ry. Co.* v. *Mills* (1926), 271 U.S. 344 [46 S.Ct. 520, 70 L.Ed. 979], was the first case decided after *Davis*. Here, employees on strike killed a railroad employee who was on his way from his place of employment to his home. At the time, "a deputy sheriff employed by petitioner [the railroad] to guard decedent . . ." (p. 345) accompanied him. The representative of the decedent argued that the railroad, having undertaken the duty of protecting its employees, negligently discharged it in providing only one guard. But the court pointed out that "There was no evidence that petitioner [the company] had ever furnished decedent or any other employee with more than one guard in going to or from work . . ." (p. 346) or evidence from which the company could have been found to have undertaken to furnish additional protection. The court, therefore, held that the question of liability should not have been submitted to the jury. As *Tatham* v. *Wabash R. Co., supra*, 412 Ill. 568 [107 N.E.2d 735], suggests, the decision has found its way into the group of cases usually cited on this problem because of the court's statement: "It is not contended that any duty growing out of the relationship of employer and employee required the employer to guard the employee against violence by strikers. Compare *Davis* v. *Green*. . . ." (P. 346.) In any event an employer's liability for provision for a safe place to work is readily distinguishable from an obligation to protect employees from strikers' assaults when employees have left the employer's premises.

In the third case of this series, *Atlanta & Charlotte Air Line R. Co.* v. *Green* (1929), 279 U.S. 821 [49 S.Ct. 350, 73

L.Ed. 976], reversing *per curiam*, 151 S.C. 1 [148 S.E. 633 (1928)], a gang of thieves shot and wounded a railroad employee when he unexpectedly apprehended them in the act of pillaging a car in the freight yards. The Supreme Court reversed a South Carolina court "on the authority of" *Davis, Mills,* and *Southwell.* The South Carolina court, observing that the railroad had knowledge of the dangerous situation, concluded that the evidence had been properly submitted to the jury. A dissenting opinion raises the question whether plaintiff, by pursuing one of the culprits, had left the area which the railroad was required to keep safe and had thus himself caused the injury. (Pp. 643, 644.) In any event, the *per curiam* decision of the United States Supreme Court does not enlighten us on the reasons which prompted the court.

The next federal expression, *Sheaf* v. *Minneapolis, St. P. & S. S. M. R. Co.* (8th Cir., 1947), 162 F.2d 110, a court of appeals, rather than a Supreme Court decision, passed upon a complaint which alleged three causes of action: (1) *respondeat superior,* (2) negligence by the railroad company in employing a person with knowledge of his vicious propensities and by ratification of his acts of violence, and (3) violation of a rule of the company and ratification by failure to discharge the attacker. The trial court dismissed the action, and the appellate court, relying on *Davis* and *Southwell,* affirmed.

While, with the exception of *Sheaf,* these cases may be said not to have passed directly upon the question of the employer's liability for negligent hiring, they are uniform in their failure to fix liability upon the employer for the intentional tort of the dangerous employee. As we have said, the issue only becomes clearer in Supreme Court expressions in 1957 and in *Lillie* v. *Thompson, supra,* 332 U.S. 459.

In *Lillie,* petitioner, a 22-year-old girl, worked as a telephone operator between 11:30 p.m. and 7:30 a.m., in a frame building in an isolated part of the railroad yards. Her duties were to receive and deliver messages to employees operating trains in the yard. In order to get the messages these men came to the building at irregular intervals throughout the night. Since there were no windows on the side of the building in which the door was located, she could identify persons seeking entrance only by unlocking and opening the door. On the night of her injury, at about 1:30 a.m., she answered the door; a man, not an employee, entered and beat her with a large piece of iron.

In granting the railroad's motion for summary judgment

the district court cited *Davis, Mills, Southwell* and *Green,* and stated "that there would be no causal connection between the injury and the . . . [railroad's] failure to light or guard the premises, and that the law does not permit recovery 'for the intentional or criminal acts' of either a fellow-employee or an outsider.'' (P. 461.) The Supreme Court reversed and remanded, declaring: "We are of the opinion that the allegations in the complaint, if supported by evidence, will warrant submission to a jury. Petitioner alleged in effect that respondent was aware of conditions which created a likelihood that a young woman performing the duties required of petitioner would suffer just such an injury as was in fact inflicted upon her. That the foreseeable danger was from intentional or criminal misconduct is irrelevant; respondent nonetheless had a duty to make reasonable provision against it [omitting footnote]. Breach of that duty would be negligence, and we cannot say as a matter of law that petitioner's injury did not result at least in part from such negligence. The cases cited by the district court [omitting footnote], we believe, do not support the broad proposition enunciated by it, and do not cover the fact situation set forth by the pleadings in this case.'' (Pp. 461-462.) Thus, the court opened the door, allegedly closed by *Davis,* for recovery based on the negligence of the employer in failing to anticipate and prevent an intentional tort.[6]

*Lillie* refers to the "conditions" which "created a likelihood" of assault of the nature that was "in fact inflicted upon her.'' In the instant case the "condition" of the employment of the dangerous employee produced the likelihood of assault of the kind suffered by appellant here. The Supreme Court declares irrelevant the kind of foreseeable danger involved, even though it might be intentional or criminal misconduct. Respondent "had a duty to make reasonable provision against it'' and the breach of the duty constituted negligence. How can it logically be concluded that this language does not apply here? To disregard it we would be compelled to take refuge in a factual distinction that presents only a differing circumstance, not a basic reason for a differing rule.

[6]The expansion of the court's theory of the railroad's duty is further illustrated by *Anderson* v. *Atchison, T. & S. F. Ry. Co.* (1948), 333 U.S. 821 [68 S.Ct. 854, 92 L.Ed. 1108]. There the complaint charged the railroad with negligence in failing to search for a missing conductor, who had in fact fallen off the train. The court reversed a judgment for the railroad granted on the ground that the complaint failed to state a cause of action, saying that if the allegations were proved a jury might find negligence by the railroad's agents.

It is true, as respondent vigorously argues, that *Lillie* points out that *Davis* and the subsequent cases which we have discussed *supra,* and which were cited in the *Lillie* litigation by the district court, "do not support the broad proposition enunciated by it, and do not cover the fact situation set forth by the pleadings in this case." (P. 462.) Of course, the factual situations differed in *Lillie* from those of the cited cases. But that does not mean that the Supreme Court declared that these situations necessarily called for the application of a different rule. Indeed, to the contrary, the court states these cases "do *not* support the broad proposition enunciated" by the district court, "that the law does not permit recovery 'for the intentional or criminal acts' of either a fellow employee or an outsider." (Emphasis added.) Hence in the instant case appellant may recover despite the intervention of intentional or criminal acts of a fellow employee.

Finally, in a series of cases in 1957 the Supreme Court emphatically stated that the crucial test of liability under FELA turns on whether or not the employer has been guilty of negligence. And one opinion has, in fact, tied that negligence into common-law negligence.

In the first of these cases, *Rogers* v. *Missouri Pacific R. Co.* (1957), 352 U.S. 500 [77 S.Ct. 443, 1 L.Ed.2d 493], the ". . . Court granted certiorari to consider the question whether the decision [of the Missouri Supreme Court reversing a jury verdict for lack of evidence to support it] invaded the jury's function." (P. 501.) In reversing the Missouri decision and asserting the right and the duty of the jury rather than the judge to make the final determination regarding negligence, the court used sweeping language: "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . for which damages are sought. . . . Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. . . . The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or *in part*' to its negligence. (Emphasis added.)" (Pp. 506-507.)

Mr. Justice Frankfurter in his dissenting opinion in *Ferguson* v. *Moore-McCormick Lines* (1957), 352 U.S. 521 [77

S.Ct. 457, 459, 1 L.Ed.2d 511, 515],[7] states: "The Court has never intimated that the concept of negligence, undefined in the statute, has some special or esoteric content as used in the Act or is anything other than a statutory absorption of the common-law concept." (P. 538.) The Justice makes it entirely clear that the concept of liability for tort under the Act is that of tort at common law. "Liability under the Act is based on negligence. [Footnote omitted.] As far as the substantive cause of action is concerned, this is the historic cause of action for negligence as it has developed from the common law. It involves the same general concept on which is based every 'negligence case' in the state courts and in the multitudinous cases in the federal courts on diversity of citizenship in which the question is merely one of common-law negligence; that is, it is the familiar type of litigation that is part of the day-to-day business of state and federal trial judges." (Pp. 537-538.)

Thus we have come the full circle in this opinion; having started with common law liability for the tort here involved, we end with it. We think it entirely clear that the recent Supreme Court rulings, and *Lillie*, imply liability of the employer for the conduct which the complaint here describes.

The Supreme Court in 1957 has adopted a liberal view of the scope of negligence and of the submission of proof to the jury in a situation in which the employer's conduct has at least in part caused the injury. We have pointed out that the current cases do not conflict with an interpretation which limits the previous contrary rulings to an application of the doctrine of *respondeat superior* rather than to primary negligence of an employer in careless hiring of a dangerous worker. In the light of the recent cases we do not believe the Supreme Court has ruled that an employer must exercise due care in furnishing an employee a safe "place" in which to work but need not exercise such care in selecting the workman who stands in the place next him. On the assembly line

[7] See also *Webb* v. *Illinois Central R. Co.* (1957), 352 U.S. 512 [77 S.Ct. 451, 1 L.Ed.2d 503], decided the same day. See DeParcq, *The Supreme Court and Federal Employers' Liability Act, 1958-1959 Term* (1960), 44 Minn. L. Rev. 707, for a commentary on the court's "liberal interpretation of the FELA with regard to its scope, available defenses, the meaning of negligence" and the preservation of jury trial. (P. 716.) The author concludes: "I firmly believe that any employee who has lost below as the result of an unjust verdict or decision may confidently expect relief from the Supreme Court." (P. 717.); DeParcq, *A Decade of Progress under the Federal Employers' Liability Act* (1953), 18 Law and Contemporary Problems 257.

or in the railroad shop an adjacent known psychotic employee is no less dangerous than an adjacent known unsafe machine.

We have stated that we would conclude with a discussion of the cases arising on this issue in the state courts, and we now do so in the recognition that they are neither conclusive nor uniform.

We have previously pointed out that the Supreme Court of Illinois, in *Tatham* v. *Wabash R. Co., supra*, 412 Ill. 568 [107 N.E.2d 735], expressly rejected the theory that *Davis* precluded recovery on the negligent retention theory, and concluded that ". . . the clear and obvious holding of the Lillie case is that when an employer is aware, or should be aware, of conditions creating a likelihood of injury, he has a duty to make provisions against this foreseeable danger, even though the threatened hazard is from the intentional misconduct of third persons." (P. 739.) The court reversed the trial court's judgment in striking the plaintiff's complaint for failure to state a cause of action.

Three state decisions, those of Kansas, Missouri and New York, predate *Lillie* and are therefore of doubtful value. The Supreme Court of Kansas in *Roebuck* v. *Atchison, T. & S. F. Ry. Co.* (1917), 99 Kan. 544 [162 P. 1153], denied the existence of a cause of action against the railroad for negligence in retaining in its employ a person of a "violent, vicious, and dangerous disposition" (p. 1154), declaring: "It is plain that it could not have been the intention of Congress to make the carrier liable for injury or death to an employe occasioned by the act of a stranger." (P. 1158.) The court considered an employee acting outside the scope of his employment a "stranger." The *Lillie* decision has definitely negated at least the language of the *Roebuck* decision.

The Missouri case of *Osment* v. *Pitcairn* (1941), 349 Mo. 137 [159 S.W.2d 666], involved an action under the FELA for injuries sustained as a result of "horseplay" by a co-employee. The court framed the plaintiff's position: "In other words, the plaintiff seeks to apply the tort doctrine of liability for negligently employing or retaining in one's employment a known habitually incompetent or vicious employee to cases arising under the Federal Employers' Liability Act. . . ." (P. 667.) The court read *Davis* v. *Green, supra*, as precluding recovery on that theory, but the court did not have the benefit of *Lillie*.

The New York decision of *Zoccano* v. *Long Island R. Co.*

(1948), 298 N.Y. 553 [81 N.E.2d 96], sets forth only the opinion of the trial court, which predated *Lillie*.

Two state cases, decided after *Lillie*, *Young* v. *New York Central R. Co.* (1949), 88 Ohio App. 352 [88 N.E.2d 220], and *Amann* v. *Northern Pacific Railway Co.* (1955), 130 Mont. 11 [292 P.2d 753], attempt to distinguish that case. The court in *Young* cited *Davis* and stated that *Lillie* "has not repudiated, either expressly or impliedly, the doctrine of *Davis* v. *Green* and following cases of factual analogy." (P. 225.) The Supreme Court denied certiorari, 339 U.S. 986 [70 S.Ct. 1008, 94 L.Ed. 1388]. The court in *Amann* followed *Young*, emphasizing the Supreme Court's failure to grant certiorari in that case, and positing its conclusion upon its interpretation of *Davis*. One Justice dissented, however, relying on *Lillie* and distinguishing *Davis* as predicated exclusively upon the theory of *respondeat superior*. The two cases directly conflict with *Tatham*.

We conclude that subsequent cases have limited and clarified *Davis*. The definition of an employer's liability under FELA for the negligent hiring and retention of a dangerous employee has not been frozen into one interpretation of a single sentence of *Davis*. To read that sentence, and subsequent applications of it, into a mechanistic exclusion of all actions based upon an employer's tortious hiring and retention of an employee is to say that the act is in disharmony with the rule of common law and with the decisions pertaining to seamen. More important, it is to disregard the later expressions of the Supreme Court and of *Lillie*. It is to assume the act has been read to create distinctions out of touch with reality. We do not believe that the application of FELA has been so grotesquely distorted.

We reverse the judgment.

Bray, P. J., and Duniway, J., concurred.

A petition for a rehearing was denied May 19, 1961, and respondent's petition for a hearing by the Supreme Court was denied June 21, 1961.